IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 23, 2017

**DAVID E. SCOTT  v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 103215   G. Scott Green, Judge**

_____

**No. E2016-01184-CCA-R3-PC**

_____

The Petitioner, David E. Scott, appeals from the Knox County Criminal Court's denial of his petition for post-conviction relief.  He is serving an effective twenty-two-year sentence for his convictions of attempted voluntary manslaughter, aggravated assault, and aggravated kidnapping.  On appeal, he contends that the post-conviction court erred in denying relief on his claim that he received the ineffective assistance of counsel when trial counsel advised him not to testify.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Gerald L. Gulley, Jr. (on appeal) and Liddell Kirk (at hearing), Knoxville, Tennessee, for the appellant, David Earl Scott.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Petitioner's convictions relate to events which transpired between the Petitioner and his estranged wife on July 25, 2009.  Notwithstanding the fact that the victim had an order of protection which prohibited the Petitioner from coming near her, the Petitioner came to the house where she lived with their children, entered the home against her will, searched and retained her cell phone and landline telephone, struck her repeatedly, took her into a walk-in pantry and closed the door behind them, and threatened her with a large barbecue skewer and began strangling her. He dragged her

upstairs, pushed her into a bathroom and closed the door, inquired whether she thought drowning was a good way to die, wrapped a belt around her neck, wrapped an electrical cord around her neck, took her to the garage, ordered her to her knees, attempted unsuccessfully to bind her hands with a cord, and forced her upstairs to the master bedroom to lie in bed with him. The victim was able to escape with her children to a neighbor's house when the police arrived at the house after her male friend, whom the Petitioner had called twice the previous evening, alerted the authorities that he was concerned for her safety. *State v. David Earl Scott*, No. E2011-00707-CCA-R3-CD, 2012 WL 5503951, at *1-3 (Tenn. Crim. App. Nov. 14, 2012), *perm. app. denied* (Tenn. Mar. 5, 2013).

On appeal, this court determined that insufficient evidence of serious bodily injury existed to support an especially aggravated kidnapping conviction but that sufficient evidence of bodily injury existed to support an aggravated kidnapping conviction on that count. In all other respects, a majority of the panel affirmed the Petitioner's convictions. *See id.* at *5-16. The dissenting judge disagreed with the majority's conclusion that the State offered insufficient evidence of serious bodily injury to support the especially aggravated kidnapping conviction. *See id.* at *16 (Wedemeyer, J., dissenting).

The Petitioner filed a pro se post-conviction petition alleging that he received the ineffective assistance of counsel in the conviction proceedings. Post-conviction counsel was appointed and filed an amended petition alleging that the Petitioner received the ineffective assistance of counsel and was deprived of due process in the conviction proceedings. The amended petition focused on trial counsel's failure to advise the Petitioner to testify, which the Petitioner alleged would have resulted in the material likelihood of a more favorable outcome at the trial.

At the post-conviction hearing, trial counsel testified that before the Petitioner's trial, he and the Petitioner discussed the allegations the Petitioner faced, the Petitioner's right to testify, and the fact that it was the Petitioner's decision whether to testify. In counsel's opinion, the Petitioner's testimony would have not helped the defense and could have been harmful. Counsel said he advised the Petitioner accordingly. He thought the Petitioner understood that the decision whether to testify was the Petitioner's. Counsel said his opinion that the Petitioner should not testify was strengthened by the victim's testimony, which he described as compelling. Counsel said the trial court conducted a hearing pursuant to *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), in which the Petitioner was advised of his rights relative to testifying and in which the Petitioner stated he had elected not to testify. Counsel stated that in addition to his concerns about the Petitioner's testimony not helping the defense, he was concerned because the Petitioner had stated at one point, "You tell me what to say, and I'll say it." Counsel stated, as well, that his advice to the Petitioner about whether to testify was based upon

counsel's opinion that the victim's account of waking up from unconsciousness but not knowing how long she had been unconscious fell short of establishing serious bodily injury, an element of especially aggravated kidnapping. He noted that, ultimately, the appellate court agreed with him that the State failed to prove serious bodily injury. Counsel stated that the victim's testimony established many of the facts to which the Petitioner would have testified, such as that the victim met the Petitioner on the porch and let him inside the house. Counsel said he had been concerned that the Petitioner might say something about the victim's unconsciousness or the Petitioner's motives.

Trial counsel agreed that the Petitioner had been charged with attempted second degree murder but that he was convicted of attempted voluntary manslaughter, which counsel described as "[c]loser to a win [than] an outright loss." Counsel agreed that photograph exhibits showed the victim had black eyes. He said that the victim testified about being in pain and that he vigorously cross-examined her about how she went to work despite having the injuries to which she testified. Counsel said he found it interesting that the legislature amended the aggravated assault statute soon after this court's decision in the previous appeal. He said he cross-examined the victim about her "agreeably coming with" the Petitioner and, at times, following him, through the house during the events. Counsel said he tried to show that the victim was not confined and might have been able to go outside.

Trial counsel agreed that he had been aware when he discussed with the Petitioner the possibility of testifying that the Petitioner had at least three prior felony convictions. He said, however, that the prior convictions had not been his greatest concern relative to the Petitioner's testifying. Counsel said he also had been aware that the Petitioner had a history of domestic violence. Counsel said he had been greatly concerned about the State's notice relative to Petitioner's having used a false name to make a collect telephone call from the jail. Counsel was concerned, as well, by the fact that the victim and the Petitioner's family members could testify that the Petitioner was untruthful, had stolen from them, and had withdrawn money from their bank accounts. Counsel did not recall the Petitioner's having lost a job because the Petitioner stole a car.

Trial counsel testified that another significant concern had been the recordings the prosecutor provided to him, which reflected that the Petitioner had called his minor child and attempted to have the child influence the victim to drop the charges. Counsel said that although the recordings had been provided late and the trial court had ruled they were not admissible during the State's case-in-chief, counsel thought that the recordings would have been admitted if the Petitioner had testified. Counsel did not recall whether he was aware the Petitioner violated the restraining order by sending a letter to the victim "while his sentencing was pending."

Trial counsel testified that he had thought when he drafted the appellate brief that "we had some shot . . . of whether or not the kidnapping was distinguishable from the other offenses." He said, however, that after he submitted the brief, an appellate decision was filed which "severely impacted . . . our chances on appeal." He agreed that this court had considered whether to remand the case for a new trial at which jury instructions that were consistent with *State v. White*, 362 S.W.3d 559 (Tenn. 2012), were given, and that this court determined that a new trial was not required. Counsel said he filed an application for permission to appeal to the Tennessee Supreme Court but that the application had been denied.

The Petitioner testified that he discussed the allegations against him when "[trial counsel] showed up for about an hour and a half one time" before the trial. The Petitioner said counsel told him that he "would be an idiot" if he testified and that the prosecutor would "eat my lunch." When asked if he understood that the choice whether to testify was his, the Petitioner responded, "I had paid him a lot of money and I trusted what he told me. I put complete faith in him to do what he told me to do." The Petitioner acknowledged, however, that counsel told the Petitioner the decision belonged to the Petitioner and that counsel advised the Petitioner that testifying would not be in the Petitioner's best interests. The Petitioner said that he wanted to testify to correct untruths and misstatements that occurred during the trial but that he had relied on counsel's advice. The Petitioner said that during the trial, evidence was elicited that he was on probation, that the Petitioner said something, that counsel said, "[S]hhh keep your mouth shut," and that counsel stated he would "handle it."

The Petitioner testified that he disagreed with many of the facts to which the victim testified. When asked if he told this to trial counsel, he said they never had an opportunity to talk other than "in the bullpen." The Petitioner said, though, that he told counsel the victim had not testified accurately about the relevant events and that he had asked counsel if there was anything that could be done. The Petitioner said counsel advised him not to testify and that he relied on the advice. The Petitioner said he recalled the relevant events and would have been able to testify about his recollection of what happened.

The Petitioner testified that he had lived previously in the home in which the victim lived at the time of the offenses. He said that the home was titled in his name and that he had "just put down over $60,000" on it. He said he and the victim had been together for nineteen years without a "domestic incident" but acknowledged that at the time of the offenses, he had a pending aggravated assault charge in which the victim was the alleged victim. He said that he knew about an agreed order of protection and that it only allowed him to speak to the victim about financial matters and their children.

- 4 -

The Petitioner testified that on the date of the relevant events, he and the victim had spoken earlier in the day and that the victim had told neighbors he would be "coming around." He said the victim was supposed to have gone earlier that day to "drop" the order of protection. He said that he asked the victim by telephone if he could come to the house and that she had been in bed and had suggested they talk the next day. He said that notwithstanding the victim's preference to talk the next day, he decided to go to her house because he was out, had things to do the next day, and was upset.

The Petitioner testified that he had been talking to the victim by telephone when he arrived at her house. He said that when she came to the door, she suggested they "go around back and talk." He said they went to the patio to smoke. He said that he entered the house to get a drink of water and that she followed him. He said he had locked the door and said, "how's that feel . . . to be locked out of your own house," before unlocking the door and allowing her to enter. He said she followed him upstairs "to check on the children." He said they entered a bathroom. He acknowledged that he grabbed a cell phone to see the numbers stored in it, that he had not seen any numbers, that he grabbed the landline telephone, that he saw the number "of this guy she was having an affair with," and that he lost his temper. He said they went to the kitchen, where he "was being a smart aleck," turned on the garbage disposal, and acted as if he were going to drop the victim's telephone into the disposal. He said he had been angry because the victim was having an affair, because he was not allowed in his own home, because his children were being taken from him, and because his "whole livelihood was wrong." He said he wanted the victim to know what it felt like to be "jerked around." He said that although he had been placed on disability recently before the relevant events, he had earned over $100,000 per year in the "car business" and had money in the bank. He disputed that the victim had been the sole provider for the family.

The Petitioner acknowledged that he began striking the victim after he found a telephone number in the telephone. He said that he hit her "[p]robably twice with a back hand," not his fist, and that he regretted hitting her. He acknowledged that he gave the victim "a black eye" and bloodied her nose. He said he was an "idiot." He said he did not think the victim was ever unconscious and that, in his opinion, "that came from the DA to press the charges." He said he did not place the victim in the pantry and said it was as large as many kitchens. He said that they walked into it together and that he had not locked the pantry's door. He acknowledged he had tried to choke the victim with his hands in the pantry and said he wanted to scare her but did not know what he had been thinking. He denied putting a belt and an electrical cord around the victim's neck but said he had pushed a belt and a thin cord from a video gaming system against her neck. He did not think he had physically injured the victim and thought she had been coached in her testimony.

- 5 -

The Petitioner testified that he went upstairs after leaving the pantry and that the victim followed him. He agreed that he had been in the bathroom, had run water, and had threatened to drown the victim, but he said he thought this occurred before the incident in the pantry. He said he had only been trying to intimidate the victim into returning to their relationship. He said he had been "out of it." The Petitioner stated that at one point, one of the children came out of a bedroom and wanted a glass of water. He said he went into the master bathroom upstairs while the victim went downstairs to get water for the child. He said that after the child returned to bed, he and the victim talked and smoked a cigarette downstairs. He said they discussed the victim's dropping the order of protection.

The Petitioner acknowledged the victim's testimony that after the discussion, they went into the garage. He denied that he asked her to get on her knees and said she was on her knees getting something from a shelf for him to sell in his mother's yard sale. He denied that he tried to tie up the victim with a weed trimmer cord and said any marks on the victim's wrists were from her ponytail holder. He said that he was not trying to confine the victim in the garage and that she could have left at any time. He said the victim knew he would not hurt their children.

The Petitioner testified that he and the victim first had a problem when he found her in bed with a man with whom she worked. He said the incident that gave rise to the order of protection related to his following too closely in a car and that he had not injured the victim. He said the victim obtained the order of protection in order to "move a young little 26 year-old man in there and spend my money and live in my home." He thought that the victim viewed him as not "that good" now that he was "sick" and not earning as much money.

The Petitioner testified that he fell asleep when he and the victim lay down together and that he used the bathroom and showered while she cooked breakfast and dressed the children. He said she could have left while he showered. He said he had been intoxicated from about one fifth of liquor and "heavy duty pain medication" during the relevant events. He said he would not have touched the victim if he had not been using alcohol. He said, "I had never laid a hand on her." He stated, though, that he had yelled at her, hit the wall, and thrown things. He acknowledged that he had put the victim's cell phone in his pocket on the night of the incident but said telephones connected to the landline were "all over the house." He said he called the person with whom the victim was involved the next morning and told the man that he was a "home wrecker," to stay out of the Petitioner's house, and not to call the house again. He said he might have threatened to "whoop" the man.

- 6 -

When asked about other trial evidence he disputed, the Petitioner noted contradictions between the victim's statement in a police report that she was strangled with a cord until she lost consciousness and her trial testimony that she was "knocked unconscious in the kitchen." He said that she never lost consciousness but that she had been on the kitchen floor. He said that another time, "they" said the victim had been unconscious in an upstairs bathroom. He said he was sure the victim fell asleep for a while because everyone woke when the telephone rang in the morning. He said he had been "dead asleep." He described the victim as "[r]eally a good girl" but thought she was confused about what to say in her testimony in order to get him "out of the picture."

The Petitioner testified that his goal had been to stay at the house, which he said had been built for their family and was their dream house. He said he did not prevent the victim from leaving and would not have stopped her from leaving. He acknowledged he was guilty of assaulting the victim but said he was not guilty of the "exaggerated charges." He disavowed any intent to kill her and said that if he had wanted to kill her, he would have. He said he wanted to scare the victim, which he said had been the worst mistake of his life.

The Petitioner acknowledged he had three prior felony convictions and a misdemeanor conviction. He acknowledged that he was in violation of an order of protection at the time of the present offenses. He acknowledged that the State would have been able to impeach him with the prior criminal convictions and the violation of the order of protection if he had testified at the trial. He said the victim had been a good witness at the trial and stated she had been coached well. When asked if he thought the jury would have believed him over the victim, he said, "No, not after the way [the prosecutor] taught her to talk. No." He said, though, that he thought his testimony would have made a difference.

After receiving the proof, the post-conviction court denied relief in a written order. The court credited trial counsel's testimony that counsel met with the Petitioner and discussed the Petitioner's right to testify, that counsel informed the Petitioner that the decision whether to testify was the Petitioner's, and that they discussed the facts about which the Petitioner might testify. The court found that the victim's testimony reinforced counsel's advice to the Petitioner that the Petitioner should not testify. The court found it significant that the Petitioner had prior felony convictions which would have been available to impeach the Petitioner's testimony and that the jury would have learned about the Petitioner's recorded calls with the Petitioner's child in which the Petitioner attempted to influence the victim's testimony. The court noted that the trial record reflected that the Petitioner was advised of his rights as required by *Momon*.

The post-conviction court found that trial counsel's advice against the Petitioner's testifying had been reasonable, tactical, and effective based upon the facts of the case. The court noted that counsel was able to obtain an acquittal of an indicted count and a reversal on appeal that resulted in a reduction in the Petitioner's sentence from thirty-five to twenty-two years. Thus, the court concluded, the Petitioner received the effective assistance of counsel and was not entitled to relief. This appeal followed.

The Petitioner contends that the post-conviction court erred in denying relief on his claim that he received the ineffective assistance of counsel when trial counsel advised him not to testify at the trial. The State counters that the court properly denied relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of

hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Petitioner argues that he was the only person who could have rebutted the victim's testimony; therefore, he contends, trial counsel acted unreasonably in advising him against testifying. He notes counsel's testimony that the victim's testimony was compelling and argues that counsel's advice denied him the opportunity to present a more balanced version of the relevant facts, particularly as related to the aggravated kidnapping conviction. He argues that the jury was denied the benefit of his testimony regarding the victim's voluntarily moving throughout the house, smoking, having conversation, and going to bed with him. He also notes that the jury did not hear how the victim remained in the house cooking breakfast as he showered. He argues, as well, that because he did not testify, the jury did not hear about the victim's agreeing to drop the order of protection against him.

As we have stated, trial counsel testified that he discussed the Petitioner's potential testimony with the Petitioner and that in counsel's view, the Petitioner was better served by not taking the stand. Counsel noted the Petitioner's attempt to influence the victim's testimony through their child, his thefts and dishonesty relative to family members about which they could testify, and, to a lesser extent, the Petitioner's prior convictions. Counsel testified that the victim was a good witness and that her testimony reinforced his opinion that the Petitioner should not testify. The trial court conducted a *Momon* hearing to ensure that the Petitioner was aware of his rights relative to his decision whether to testify and that his decision not to testify was knowingly and voluntarily made. The Petitioner conceded that the victim had been a good witness but claimed his testimony nevertheless would have made a difference.

The post-conviction court found that counsel's advice had been reasonable, tactical, and effective. As the court noted, counsel obtained an acquittal of the attempted second degree murder count, and the Petitioner was convicted, instead, of the lesser included offense of attempted voluntary manslaughter. In addition, counsel obtained appellate relief from the especially aggravated kidnapping conviction, which this court reduced to aggravated kidnapping and which resulted in a reduction in the Petitioner's

sentence from thirty-five to twenty-two years. The post-conviction court concluded that the Petitioner received the effective assistance of counsel and was not entitled to relief.

On review, we conclude that the evidence does not preponderate against the post-conviction court's factual findings. We conclude, as well, that the court's factual findings support its determination that the Petitioner failed to establish that he was entitled to post-conviction relief. The Petitioner has not shown that the post-conviction court erred in denying his petition.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE